1
2
3
4
5
6
7
8

**UNITED STATES DISTRICT COURT**

9

**SOUTHERN DISTRICT OF CALIFORNIA**

10

11   JOSEPH BECKER,

Civil No.    10cv1209 (AJB)

12                                        Petitioner,

**ORDER GRANTING IN PART AND**
**DENYING IN PART PETITION FOR**
**WRIT OF HABEAS CORPUS**

13              v.

14   M. MARTEL, Warden,

15                                        Respondent.

16

17          Petitioner Joseph Becker (hereinafter "Petitioner"), a state prisoner proceeding *pro se* and *in*

18   *forma pauperis*, filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.  On October 22,

19   2010, Respondent filed an answer.  Petitioner filed a traverse on November 11, 2010.  This Court has

20   reviewed the petition for writ of habeas corpus, Respondent's answer, Petitioner's traverse, and all

21   supporting documents.  After a thorough review, this Court **GRANTS IN PART AND DENIES IN**

22   **PART** the petition for writ of habeas corpus.

23                                  **Procedural Background**

24   **A.       Conviction and Sentence**

25          On October 21, 2004, Petitioner was arraigned on a forty-one count complaint.  (1 CT 41-57;

26   Pet., Ex. 2.)  On December 21, 2004, Petitioner was arraigned on an amended fifty-three count

27   complaint after the district attorney added eleven counts of attempting to prevent and dissuade a witness

28   from testifying and one count of making a criminal threat. (1 CT 21-40; Pet., Ex. 3.) On March 9, 2005,

Petitioner was arraigned on a forty-eight count information. (1 CT 41-57; Pet., Ex. 4.)  The information mostly set forth the allegations in the amended complaint and also included an added charge of stalking. (1 CT at 44.)  After a hung jury at the first trial, on July 27, 2006, Petitioner was arraigned on an amended forty-eight count information that differed from the original information in several minor ways.  (1 CT 58-73; Pet., Ex. 5; Resp't Mem. of P & A at 11.)

On August 23, 2006, Petitioner was convicted of four counts of attempting to make a criminal threat in violation of California Penal Code ("Penal Code") sections 422/664; fifteen counts of making a false report of a bomb to an agency or business in violation of Penal Code section 148.1(a); fifteen counts of making a criminal threat in violation of Penal Code section 422; seven counts of attempting to prevent and dissuade a witness in violation of Penal Code section 136.1(a)(2); and one count of stalking in violation of Penal Code section 646.9(a).  (4 CT 911-15; 5 CT 1098-1104)  Petitioner admitted he served two prior prison terms.  (5 CT 1098-1104.)  On October 6, 2006, Petitioner was sentenced to 20 years and 4 months in prison.  (5 CT 1104.)

**B.     Direct Appeal**

Petitioner filed a direct appeal with the California Court of Appeal, Fourth Appellate District, Division One. (Lodgment 1-3.) On October 23, 2008, the Court of Appeal affirmed the conviction but remanded the matter for re-sentencing after concluding that the trial court abused its discretion in denying Petitioner's request for reinstatement of counsel at the new trial/sentencing hearing. (Lodgment 4.) Petitioner filed a petition for review in the California Supreme Court. (Lodgment 5.) That petition was denied on February 11, 2009. (Pet., Ex. 7.) On July 10, 2009 and again on January 27, 2010, the trial court resentenced Petitioner to 20 years and 4 months in prison. (Lodgment 6, 7.)

Petitioner appealed again to the Court of Appeal. However, on September 20, 2010, he filed a notice of abandonment of his appeal. (Lodgment 8.) That same day, the appeal was dismissed and the remittitur issued. (Id.)

**C.     Instant Federal Petition for Writ of Habeas Corpus**

Petitioner filed the instant federal petition on May 11, 2010 challenging his conviction.  On October 22, 2010, Respondent filed an answer.  Petitioner filed a traverse on November 22, 2010.  On December 13, 2010, the parties consented to jurisdiction by United States Magistrate Judge Anthony

1    J. Battaglia. Subsequently, then Magistrate Judge Battaglia was elevated to a district judge. On March

2    11, 2011, District Judge Anthony J. Battaglia was added as the district judge on the case. On March 25,

3    2011, the Court issued an order directing Respondent to provide additional information about the

4    possible maximum penalties Petitioner would have faced at the December 21, 2004 arraignment on the

5    amended complaint; at the March 9, 2005 arraignment on the information; and at the July 27, 2006

6    arraignment on the amended information. (Dkt. No. 18.) On April 6, 2011, Respondent filed a

7    response.

8                                           **Factual Background**

9           The following factual background is taken from the Court of Appeal opinion in <u>People v. Becker</u>,

10   unpublished opinion (Cal. Ct. App., 4th Dist., Div. 1, Oct. 23, 2008). The Court presumes these factual

11   determinations are correct pursuant to 28 U.S.C. § 2254(e)(1).

12

13           The charges in this case arose after Becker shoplifted merchandise from the Sam
             Goody Musicland (Sam Goody) store at University Towne Center mall on
14           January 16, 2004, and the Target store on Balboa Avenue on February 29, 2004.
             Based on this conduct, Becker was charged with petty theft with a prior and
15           burglary (the shoplifting case). He elected to represent himself in the shoplifting
             case, and was given phone privileges in jail to facilitate his self-representation.
16           In July and August 2004, while Becker was in jail waiting to be tried in the
             shoplifting case, numerous threatening phone calls were received by entities or
17           persons associated with the shoplifting case. In October 2004, charges were filed
             against Becker based on this threatening conduct (the threats case). In November
18           2004, after the initial charges were filed in the threats case, witnesses involved
             in the threats case were targeted for additional threatening or intimidating
19           conduct. In December 2004, the charges in the threats case were amended to add
             allegations against Becker based on this conduct occurring in November 2004.
20           Further, in March 2005 the charges were amended to add a stalking charge based
             on Becker's conduct of repeatedly contacting a particular witness. The threats
21           case is currently before us for review.

22           At trial, a primary issue in dispute was the identity of the person who made the
             threatening phone calls. According to the prosecutor, most of the witnesses were
23           not in a position to identify Becker as the person who made the threatening
             phone calls by listening to his voice, and except for one witness, the prosecutor
24           did not offer witness testimony tying the caller's voice to Becker's voice.
             Instead, the prosecutor presented evidence showing that Becker had access to jail
25           phones used to call victims' phone numbers during relevant time periods; Becker
             had a motive to target the entities or persons who received the calls; and Becker
26           made statements to the police showing consciousness of guilt.

27           Two jury trials were held to adjudicate the threats case. [Becker] represented
             himself at both trials. The first trial acquitted Becker of one criminal threat
28           charge, and was unable to reach a verdict on the remaining charges. The second

jury convicted Becker on most of the charges.[1]  Becker's sentence for the threats case was combined with his sentence for the shoplifting case; he received a total of 20 years, four months for both cases.

We shall briefly summarize the facts, and present more facts as necessary during our discussion of Becker's various challenges to the judgment.

*Threats to "Shoot Up" the Sam Goody Store*

On July 20, 2004, approximately seven months after the theft at Sam Goody, Becker made two phone calls to the University Towne Center mall making threatening statements directed at the Sam Goody store.  The first call was received by Joaquin Barrera, the security supervisor for the mall.  Becker stated he was going to "shoot up" the Sam Goody store and that he had problems with his daughter buying drugs from a Sam Goody's manager named Erich.  Using the caller ID feature on the security office phone, the authorities ascertained that the call had been made from the county jail.  Barrera reviewed his logs and determined that Becker was the only person whom he had arrested at the Sam Goody store that year.  Barrera, who had detained Becker during the Sam Goody shoplifting incident in January 2004, recognized the caller's voice as Becker's.  Sam Goody's manager, Erich Mroz, had caught Becker shoplifting and had testified against him at his May 2004 preliminary hearing in the shoplifting case.

The second call on July 20 was made to the Red Robin restaurant in the mall.  In this call, Becker stated that something bad was going to happen at the Sam Goody store and warned that some of the restaurant employees might get hurt if they came to work.

On July 28, 2004, Becker again called the Red Robin restaurant; in this call he stated that Sam Goody's manager, Erich, and his employees, were dealing drugs at the restaurant.  Becker also called the mall's security office and stated that he and a friend were about to go to the Sam Goody store to "shoot it up" and that Sam Goody's manager Erich was selling drugs.  The caller ID feature on the security office phone showed the call came from the same jail phone number as the July 20 call received by Barrera.

Sam Goody manager Mroz was informed about the threatening calls, but he perceived them as "ridiculous" and not as legitimate threats.

For this conduct, Becker was convicted of three counts of attempted criminal threat with Mroz as the victim (i.e., two counts occurring on July 20 and one count occurring on July 28).[2]

*False Bomb Reports*

Beginning on August 12, 2004, Becker made a series of phone calls to various businesses, stating there was a bomb or an explosive device in the building and parking lot.  On August 12, 2004, he made false bomb report calls to the Target store on Balboa Avenue and to the San Diego County Public Defender's office

---

[1]  The jury convicted Becker on 42 counts, and was unable to reach a verdict on six counts.  The trial court granted the prosecution's motion to dismiss the charges for which the jury could not reach a verdict.

[2]  The jury was unable to reach verdicts on four counts alleging that this same conduct constituted the offense of attempting to dissuade a witness.

(which had assisted him with complaints about his treatment at the jail).  On August 13, 2004, he made false bomb report calls to the Sears store in the University Towne Center mall; to the Target store on Balboa Avenue; to six other Target stores at locations throughout San Diego county; and to a Mervyn's store (which was owned by the same company as Target).  On August 20, 2004, Becker made two more false bomb report calls to the Target store on Balboa Avenue.

For this conduct, Becker was convicted of 15 counts of making a false bomb report, 14 counts of making a criminal threat, and one count of attempted criminal threat.

*Attempts to Dissuade Witnesses from Testifying*

On November 4, 2004, after Becker was charged with making false bomb reports, he received discovery that disclosed the addresses, phone numbers, date of birth, and other personal information of witnesses who had provided information to the police about the false bomb reports.  Becker copied the names, ages, addresses, and phone numbers of six female witnesses on two pieces of paper.  On the top of one paper he wrote: "Here are some chicks' addresses from a chat line I got."  On the top of the other paper he wrote: "All girls want pen pals and will visit."  These two papers then came into the possession of two other jail inmates, Cyrus Brooks and Diego LaMadrid.

Three of the female witnesses listed on the papers received phone calls at their homes from other inmates.  On November 6, and 10, 2004, Shawn Abbott received numerous messages or calls on her home phone stating she had a collect call from a detention facility from a man named Cyrus Brooks.  On November 18, 2004, Nicole Bratman received a call at home from an inmate, who told her he was in Donovan State Prison and had gotten her name, number, and address from a church community group to be a pen pal.  On November 18, 2004, Cheryl Melucci received a message on her home answering machine from Diego at the county jail who stated he was looking for her and he would mail her a letter.

Based on his dissemination of the female witnesses' personal information, Becker was convicted of committing (on November 5, 2004) six counts of attempting to dissuade a witness from testifying. The six women specified on the lists were identified as the victims.[3]

*Threats and Stalking Directed at Abbott*

Abbott was the receptionist at the San Diego County Public Defender's office who received the August 12, 2004 false bomb report call from Becker.  Abbott testified that she later began receiving numerous threatening calls, and that she knew the caller was the same person who made the August 12 call.  On November 12, 2004, Abbott received a call at the public defender's office.  In this call, Becker stated: "'I want you to know that this bomb threat issue is not going to be dropped. I've heard them talking in here.  There's five or six people involved.  I know you're receiving calls from other numbers now.  Your information is all over the jail.  I got your information from the police report . . . . [¶] . . . Don't think that they are not coming after you because they are.  They're

---

[3]  The jury convicted Becker of attempting to dissuade the six female witnesses (including Abbott) on November 5, 2004, but was unable to reach verdicts on two counts alleging additional attempts to dissuade Abbott on November 6 and November 10, 2004.

not going to let you testify.  That's all I needed to let you know.'"  The caller also stated her address, phone number, and date of birth.  In another call on her birthday (answered by a different receptionist) the caller wished Abbott a happy birthday.  When Abbott received the November 12, call, she was "really scared" because she knew the caller was not "playing a game" and the harassment was not going to stop.

For this conduct, Becker was convicted of the following additional offenses against Abbott: (1) one count of stalking on or about between August 12 and November 12, 2004, and (2) making a criminal threat and attempting to dissuade a witness on November 12, 2004.

(Lodgment 4.)

### Discussion

**A.     Scope of Review**

28 U.S.C. § 2254(a) provides:

The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.

28 U.S.C. § 2254(a).  As amended, the AEDPA now reads:

(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim- -
(1) resulted in a decision that was <u>contrary to</u>, or involved an <u>unreasonable application</u> of, clearly established Federal law, as determined by the Supreme Court of the United States; or
(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in State court proceeding.

28 U.S.C. § 2254(d) (emphasis added).

To obtain federal habeas relief, Petitioner must satisfy either § 2254(d)(1) or § 2254(d)(2).  <u>See</u> <u>Williams v. Taylor</u>, 529 U.S. 362, 403 (2000).  The threshold question is whether the rule of law was clearly established at the time petitioner's state court conviction became final.  <u>Id.</u> at 406.  Clearly established federal law, as determined by the Supreme Court of the United States "refers to the holdings, as opposed to the dicta, of this Court's decisions as of the time of the relevant state-court decision."  <u>Id.</u> at 412; <u>see also</u> <u>Lockyer v. Andrade</u>, 538 U.S. 63, 71 (2003).  However, Ninth Circuit case law may be "persuasive authority for purposes of determining whether a particular state court decision is an

'unreasonable application' of Supreme Court law, and also may help us determine what law is 'clearly established.'" <u>Duhaime v. Ducharme</u>, 200 F.3d 597, 600 (9th Cir. 2000). Only after the clearly established Federal law is identified can the court determine whether the state court's application of that law "resulted in a decision that was contrary to, or involved an unreasonable application of" that clearly established Federal law. <u>See</u> <u>Lockyer</u>, 538 U.S. at 71-72.

A state court decision is "contrary to our clearly established precedent if the state court applies a rule that contradicts the governing law set forth in our cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent." <u>Williams</u>, 529 U.S. at 405-406. "A state-court decision involves an unreasonable application of this Court's precedent if the state court identifies the correct governing legal rule from this Court's cases but unreasonably applies it to the facts of the particular state prisoner's case" or "if the state court either unreasonably extends a legal principle from our precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." <u>Id.</u> at 407. Under <u>Williams</u>, an application of federal law is unreasonable only if it is "objectively unreasonable." <u>Id.</u> at 409. Further, a state court's decision results in a "decision that was based on an unreasonable determination of the facts in light of the evidence presented in State court proceeding" if it "is so clearly incorrect that it would not be debatable among reasonable jurists." <u>Jeffries v. Wood</u>, 114 F.3d 1484, 1500 (9th Cir. 1997) (citations omitted).

In making such a determination under AEDPA, the court looks to the state's last reasoned decision. <u>Avila v. Galaza</u>, 297 F.3d 911, 918 (9th Cir. 2002). Where there is no reasoned decision from the state's highest court, the Court "looks through" to the underlying appellate court decision. <u>Ylst v. Nunnemaker</u>, 501 U.S. 797, 801-06 (1991). A state court need not cite Supreme Court precedent when resolving a habeas corpus claim. <u>Early v. Packer</u>, 537 U.S. 3, 8 (2002). "[S]o long as neither the reasoning nor the result of the state-court decision contradicts [Supreme Court precedent,]" <u>id.</u>, the state court decision will not be "contrary to" clearly established federal law.

**B.     Waiver of Sixth Amendment Right to Counsel at Initial Arraignment**

Petitioner argues that he did not make a knowing and intelligent waiver of his right to counsel

1   at his initial arraignment on October 21, 2004.  Specifically, he claims that the trial court failed to

2   inform him about the nature of the charges against him, the possible punishment he would receive and

3   that he did not receive a copy of the complaint at the hearing.  Respondent opposes arguing that the trial

4   court properly found that Petitioner made a voluntary, intelligent waiver of his right to counsel.

5          A defendant in a criminal case has the constitutional right to be represented by counsel and also,

6   if he chooses, a right to represent himself.  Faretta v. California, 422 U.S. 806, 807 (1975).  The Sixth

7   Amendment right to counsel may be waived by a defendant, so long as relinquishment of the right is

8   knowing, and intelligent.  Id. at 835.  "Although a defendant need not himself have the skill and

9   experience of a lawyer in order competently and intelligently to choose self-representation, he should

10  be made aware of the dangers and disadvantages of self-representation, so that the record will establish

11  that 'he knows what he is doing and his choice is made with eyes open.'"  Id. at 835 (citation omitted).

12  The defendant must be aware of "[1] the nature of the charges and [2] the possible penalties, as well as

13  [3] the dangers and disadvantages of self-representation in a complex area where experience and

14  professional training are most helpful."  United States v. Harris, 683 F.2d 322, 324 (9th Cir. 1982).

15  Although no set formula or script has been required, the court must consider the defendant's "education

16  or sophistication, the complex or easily grasped nature of the charge, and the stage of the proceeding."

17  Iowa v. Tovar, 541 U.S. at 77, 88 (2004).

18         Here, the California Supreme Court denied the petition for review without comment.  (Pet., Ex.

19  7.)  Since there is no reasoned decision from the California Supreme Court, the Court "looks through"

20  to the court of appeal decision.  See Ylst, 501 U.S. 801-06.  The court of appeal concluded that

21  Petitioner "received sufficient advisement concerning self-representation at the arraignment of the

22  original complaint so as to establish a voluntary, knowing waiver of the right to counsel."  (Lodgment

23  4 at 13.)

24         On October 21, 2004, Petitioner was arraigned on a forty-one count complaint filed by the San

25  Diego District Attorney's Office charging him with multiple counts of making a criminal threat,

26  attempting to prevent and dissuade a witness from testifying and making a false bomb report.  (Pet., Ex.

27  2.)  At the arraignment hearing, Petitioner's appointed counsel informed the trial court that Petitioner

28  wanted to represent himself and Petitioner had been advised of his constitutional rights.  (4 CT at 887-

88.)  On that date, Petitioner signed an "Acknowledgment of Constitutional Rights" form which provided:

> I understand I have a right to have an attorney defend me at all stages of the proceedings for a criminal case, and if my case involves a misdemeanor or felony and I cannot afford an attorney the court will appoint an attorney to represent me.

(1 CT 18.)  He also signed an "Acknowledgment Concerning Right of Self-Representation" pursuant to <u>People v. Lopez</u>, 71 Cal. App. 3d 568 (1977).[4]  (1 CT 19, 20.)  On that form, he acknowledged that he was being charged with "PC 422, 136.1(a)(2), 148.1(a).  Total of 41 counts."  (<u>Id.</u>)  In addition, he acknowledged that the maximum punishment he was facing was 58 years.  (<u>Id.</u>)  Not only did his counsel at the time advise him of his constitutional rights which was acknowledged by Petitioner but the rights were recited again in court on October 21, 2004.  (4 CT  889-91.)   Before the trial court recited the <u>Lopez</u> form, the judge told Petitioner, "I need you to listen carefully while I read this into the record, okay, Mr. Becker?"  (<u>Id.</u> at 889.)  The <u>Lopez</u> form sets forth advisements about a defendant's constitutional rights and the dangers and disadvantages of self-representation.  (1 CT 19-20.)  A copy of the complaint was also given to Petitioner.[5]  (4 CT 896.)  The trial court further questioned Petitioner on his literacy.  (<u>Id.</u> at 891.)  Petitioner stated that he graduated high school and had taken some college classes.  (<u>Id.</u> at 891.)  He also informed the court that he was representing himself in another case set for trial.  (<u>Id.</u> at 891-92.)

Petitioner complains that he was not given information about the nature of the charges because the <u>Lopez</u> form only listed the Penal Code sections, not told about the possible penalties and did not receive a copy of the complaint.  First, although the <u>Lopez</u> form only lists the Penal Code sections, the form indicated that Petitioner acknowledged that he received advice concerning the charged offenses.  (1 CT 19-20.)  Petitioner also received a copy of the complaint which detailed the nature of the offenses.

---

[4]  In <u>Lopez</u>, the California Court of Appeal "explore[d] the responsibilities of the trial court in making an adequate record that a criminal defendant 'voluntarily and intelligently' elects to represent himself under <u>Faretta v. California</u>, 422 U.S. 806 (1975)."  <u>Lopez</u>, 71 Cal. App. 3d at 570.

[5]  Petitioner claims that he did not receive a copy of the complaint.  According to the transcript, the deputy public defender asked the trial court, "Your honor, shall I give him my copy of the complaint?"  The Court responded, "Are the staples out?"  The deputy public defender answered, " I can take the staple out of it."  The Court stated: "Do it in compliance with what the bailiffs want you to do."  (4 CT 896.)  According to this dialogue, it appears the Petitioner received a copy of the complaint.  There is no indication that he did not receive a copy of the complaint.

1   (4 CT 896.)  Second, as to the possible penalties, the <u>Lopez</u> form indicated and the trial court stated in

2   open court that Petitioner's maximum possible sentence was 58 years.  (1 CT 19-20; 4 CT 889.)  Lastly,

3   as already stated and based on the court transcript, Petitioner was given a copy of the complaint.  (4 CT

4   896.)

5          Further, when the trial court recited the <u>Lopez</u> form in court, Petitioner did not object or indicate

6   his lack of knowledge about the charges, and he did not object or comment on the possible penalties or

7   about the dangers and disadvantages of self-representation.   There is nothing in the record to

8   demonstrate that Petitioner did not understand the contents of the <u>Lopez</u> form.  The Court concludes that

9   Petitioner was advised about the nature of the charges against him, the possible penalties he faced, and

10  the dangers and disadvantages of self-representation; and therefore, Petitioner made a knowing and

11  voluntary waiver of his right to counsel at the initial arraigment.

12         Accordingly, the state court's denial of this claim was not contrary to nor did it involve an

13  unreasonable application of clearly established federal law as determined by the United States Supreme

14  Court, nor was it an unreasonable determination of the facts.  <u>See</u> 28 U.S.C. § 2254(d).  Habeas relief

15  is not warranted on Petitioner's claim that he did not make a knowing and intelligent waiver of his right

16  to counsel at the initial arraignment on October 21, 2004.

17  **C.      Waiver of Sixth Amendment Right to Counsel at Subsequent Arraignments**

18         Petitioner argues that he was not readvised of his right to waive counsel on December 21, 2004,

19  when an amended complaint was filed adding twelve counts; on March 9, 2005, when he was arraigned

20  on the information and the information added a count of stalking; and on July 27, 2006, when Petitioner

21  was arraigned on an amended information after a hung jury on the first trial.  He argues that he did not

22  understand the possible penalties he faced at these subsequent arraignments.  (Pet. at 5c.)  Respondent

23  opposes.

24         The Ninth Circuit has held that a valid waiver of counsel carries forward through all stages of

25  the proceeding unless the defendant expressly requests counsel at a subsequent stage or the waiver was

26  limited.  <u>Arnold v. United States</u>, 414 F.2d 1056, 1059 (9th Cir. 1969) <u>cert denied.</u>, 396 U.S. 1021

27  (1970) (holding that the Sixth Amendment right to counsel applies to all critical stages of the

28  prosecution including sentencing but a new waiver is not required to be obtained at every subsequent

court appearance in the case); <u>White v. United States</u>, 354 F.2d 22, 23 (9th Cir. 1965).  "Once the defendant has knowingly and intelligently waived his right to counsel, only a substantial change in circumstances will require the district court to inquire whether the defendant wishes to revoke his earlier waiver."  <u>United States v. Fazzini</u>, 871 F.2d 635, 643 (7th Cir. 1989); <u>Schell v. United States</u>, 423 F.2d 101, 102-03 (7th Cir. 1970) (waiver of counsel invalidated by increased maximum sentence, among other things); <u>see also</u> <u>Torres v. United States</u>, 140 F.3d 392, 404 (2d Cir. 1998) (fact that judge decided to submit sentencing to jury after <u>Faretta</u> waiver did not vitiate waiver because it did not increase the penalty defendant faced).  "A requirement of readvisement under changed circumstances is consonant with the Supreme Court's repeated holding that a waiver of counsel is valid only if made with an awareness of the possible penalties and with eyes open."  <u>Spence v. Runnels</u>, 2006 WL 224442 (E.D. Cal. 2006) (<u>citing</u> <u>Von Moltke v. Gillies</u>, 332 U.S. 708, 723 (1948); <u>Faretta</u>, 422 U.S. at 835).

The Ninth Circuit has also held that a defendant must understand the maximum penalty he faces before a court can accept a waiver of counsel by looking at what the defendant understood at the time he waived his right to counsel.  <u>See</u> <u>United States v. Erskine</u>, 355 F.3d 1161, 1164-65 (9th Cir. 2004) (holding that the defendant did not understand the maximum penalty he was facing at the time of his <u>Faretta</u> waiver); <u>United States v. Balough</u>, 820 F.2d 1485, 1489 (9th Cir. 1987) (reviewing the record and formulating the operative inquiry as whether the evidence "show[ed] that Balough understood the dangers and disadvantages of self-representation at the time he sought to waive his right to counsel"); <u>United States v. Aponte</u>, 591 F.2d 1247, 1250 (9th Cir. 1978) ("The manner in which a defendant conducts his defense cannot establish his state of mind at the time he opted for self-representation.").

In <u>Erskine</u>, the Ninth Circuit held that the defendant did not understand the maximum penalty he was facing and therefore, he did not knowingly and voluntarily waive his Sixth Amendment right to counsel.  <u>Erskine</u>, 355 F.3d at 1164-65.  In that case, when the defendant asked to represent himself at trial, the judge advised the defendant about the dangers and disadvantages of representing himself, discussed the nature of the charges and the maximum penalty of one year that he would face.  <u>Id.</u> at 1163-64.  However, the maximum penalty discussed was incorrect, and the maximum penalty the defendant would face was five years.  <u>Id.</u> at 1164.  It was not until the first day of the trial that the

1   government orally informed the court about the incorrect maximum sentence.  Id. at 1165.  The Ninth

2   Circuit stated, "[d]espite a revelation that quintupled the stakes of self-representation for Erskine,

3   the court did not acknowledge its prior mistake, address Erskine to ascertain whether he had understood

4   the government's representation, advise him of the correct maximum penalty, or ask him whether in

5   light of the new and different information as to the penalty he faced, he desired to withdraw his Faretta

6   waiver.  Instead, the court simply stated: "All right. Thank you very much. Mr. Cruz, will you please

7   arraign Mr. Erskine?"  Id.  The court held that the defendant did not understand the possible penalties

8   that he faced at the time of his Faretta waiver.  Id. at 1171.

9          In Spence v. Runnels, 2006 WL 224442 (E.D. Cal. 2006), the defendant waived his right to

10  counsel and was informed that he may face up to sixteen years in prison.  Id. at 7.  A month and a half

11  later, the district attorney discovered that defendant had two serious felony priors as well as two prison

12  priors.  Id. at 8. The court heard a motion to amend the petition which was granted.  Id.  At the hearing,

13  the court advised defendant of the nature of the charges and listed the prior convictions and prison

14  terms; however, the trial court did not inform him of the revised maximum sentence.  Id.  The

15  amendments changed the maximum sentence to a total term of forty years to life.  Id.  When the court

16  asked if he was withdrawing his waiver of counsel; the petitioner replied "I'm not withdrawing

17  anything."  Id.  The magistrate judge recommended that the waiver of counsel did not remain valid at

18  the time the amended information was filed because the court did not inquire whether the new maximum

19  penalty of forty years would affect petitioner's decision to represent himself.  Id. at 12.  The district

20  court adopted the recommendations of the magistrate judge and reversed the sentence.  Spence v.

21  Runnels, 03cv376-GEB-KJM-P (E.D. Cal. 2006).

22         On October 21, 2004, Petitioner was initially arraigned on a forty-one count complaint consisting

23  of the charges of making a criminal threat; attempting to prevent and dissuade a witness from testifying;

24  and making a false bomb report.  (1 CT 1-17; Pet., Ex. 2.)  On December 21, 2004, Petitioner was

25  arraigned on an amended complaint with fifty-three counts.  (1 CT 21-40; Pet., Ex. 3)  The district

26  attorney added eleven counts of attempting to prevent and dissuade a witness from testifying and one

27  count of making a criminal threat.  (Id.)  At that hearing, the following colloquy occurred:

28

| [Deputy District Attorney]: | Your Honor, Today I filed an amended complaint. I provided a copy to Mr. Becker. I would ask that he be arraigned on it. |
|---|---|
| The Court: | Mr. Becker, you have an amended complaint? |
| The Defendant: | Yes. |
| The Court: | Does your true name appear thereon? |
| The Defendant: | Yes, it is. |
| The Court: | How do you plead to the charges in the amended complaint, guilty or not guilty? |
| The Defendant: | I am pleading not guilty again. |
| The Court: | Do you deny the allegations? |
| The Defendant: | Yes. |
| The Court: | Okay. |

(Pet., Ex. 3 at 2-3.)  At the arraignment on the amended complaint, there was no discussion about the added charges, the possible penalties and whether Petitioner wanted to continue to represent himself.

On March 9, 2005, Petitioner was arraigned on a forty-eight count information. (1 CT 41-57; Pet., Ex. 4.)  The information dismissed some counts and added a charge of stalking. (Pet., Ex. 4; 1 CT at 44.)  At the hearing, there was no discussion by the Court as to the dismissed or added charges, the possible penalties, and no discussion about Petitioner's right to counsel.  (Pet., Ex. 4.)

After a hung jury at the first trial, on July 27, 2006, Petitioner was arraigned on an amended forty-eight count information.  (1 CT 58-73; Pet., Ex. 5.)  The amended information differed from the original information in several minor ways.  (3 CT at 649.)  At the hearing, as to the issue of right to counsel, the court stated, "[a]ll right.  And the not guilty pleas will be entered.  Defendant will continue to represent himself at his request.  And the jury trial will be based on the amended information."  (Pet., Ex. 5 at 2.)

The court of appeal held that under state law, the trial court erred in failing to readvise Petitioner of his right to counsel at "his arraignments following the original October 2004 arraignment;" however, since Petitioner understood he had a right to counsel throughout the proceedings, there was no prejudice.  (Lodgment at 4 at 16.)  This included the December 21, 2004 arraignment on the amended complaint; the March 5, 2005 arraignment on the information; and the July 27, 2006 arraignment on the amended information for retrial.  (Id. at 15-16.)  As to federal law, the court stated that even if there was a failure to readvise Petitioner about self-representation violating his constitutional rights, the error was harmless beyond a reasonable doubt because the record indicated that Petitioner understood he had a right to counsel and wished to continue to represent himself.  (Id. at 19-22.)

When Petitioner initially asserted his right to represent himself on October 21, 2004, the trial court properly informed him about the nature of the charges, that he was facing a maximum penalty of fifty-eight years in prison, and told him the dangers and disadvantages to self-representation. (Pet., Ex. 2.) In Respondent's response to the Court's order, filed on March 25, 2011, requiring it to set forth the maximum penalties Petitioner would have faced at the three subsequent arraignments, Respondent determined and for the first time informed the Court that the original maximum penalty stated at the October 21, 2004 arraignment was incorrect and should have been 33 years and 8 months, not the fifty-eight years that was stated in the state court proceedings. (Dkt. No. 19 at 2.) Therefore, based on the corrected maximum penalty at the initial arraignment, at the December 21, 2004 arraignment, the maximum penalty Petitioner was facing was 41 years and 8 months; at the March 9, 2005 arraignment, the maximum penalty was 37 years and 4 months; and at the July 27, 2006 arraignment, the maximum penalty was 37 years and 5 months. (Id.)

The Court looks at what Petitioner understood and was told at the time he waived counsel. See Erskine, 355 F.3d at 1164-65; Balough, 820 F.2d at 1489. On October 21, 2004, Petitioner was arraigned on a forty-one count complaint and was informed that he was facing a maximum of fifty-eight years in prison. (1 CT 19-20; 4 CT 889.) On December 21, 2004, the district attorney amended the complaint and added twelve more counts. Therefore, the maximum penalty necessarily would have increased to more than fifty-eight years.[6] However, the trial court did not advise Petitioner about the added counts or the revised maximum penalty he would face and whether it would have affected his decision to represent himself. (Pet., Ex. 3.)

Respondent argues that since it is clear Petitioner wanted to represent himself even when he believed he was facing 58 years, he did not need to be readvised of his right to counsel in subsequent proceedings. (Resp't Response filed 4/6/11 at 3.) However, in Erskine, the Ninth Circuit pointed out the government's erroneous argument that a petitioner's Faretta waiver was valid because he was subsequently sentenced to less than what he erroneously thought was the maximum. Erskine, 355 F.3d

---

[6] In the corrected penalties provided by Respondent, the original maximum penalty should have been 33 years and 8 months at the initial arraignment on October 21, 2004. On December 21, 2004, the maximum penalty Petitioner should have been facing was 41 years and 8 months. The maximum penalty increased by eight years from the 41-count complaint to the 53-count complaint.

at 1171 n. 12.  The court explained that "the prejudice a defendant suffers is not the term *of his sentence* but rather in the *decision to forgo counsel* and, instead, to represent himself.  The choice of self-representation, in turn, increases the likelihood of a conviction and likely length of any sentence."  Id. (emphasis in original).

Here, the court of appeal erroneously applied the harmless error analysis to Petitioner's federal claim that he was not readvised of his Faretta waiver at his subsequent arraignments.  (Lodgment 4 at 19-22.)   Therefore, even though Petitioner understood that his maximum penalty at the initial arraignment was fifty-eight years, the maximum penalty necessarily increased when twelve additional counts were added in the amended complaint.  The addition of twelve counts and increased penalty was a substantial change that required the trial court to readvise Petitioner of his right to counsel.  See Fazzini, 871 F.2d at 643.  Therefore, the trial court's failure to readvise Petitioner about his right to counsel on December 21, 2004 was a violation of Petitioner's Sixth Amendment right to counsel.  As a result of the initial failure to readvise Petitioner of his right to counsel on December 21, 2004, the two subsequent arraignments on the information on March 9, 2005 and July 27, 2006 were necessarily compromised and violated his Sixth Amendment right.

Respondent argues that even if there were a constitutional error, the harmless error standard should apply.  However, the failure to meet the requirements for a valid Faretta waiver invoking the Sixth Amendment right to self-representation constitutes *per se* prejudicial error, and the harmless error standard is inapplicable.  Frantz v Hazey, , 533 F. 3d. 724 (9th Cir. 2008);  United States v. Erskine, 355 F.3d 1161, (9th Cir. 2004); United States v. Balough, 820 F.2d 1485, 1489-90 (1987) (citing Rose v. Clark, 478 U.S. 570, 577-78 (1987)); U.S. v. Arlt, 41 F.3d 516, 524 (9th Cir. 1994) (stating that a denial of the right to self-representation is '*per se* prejudicial error').  Therefore, in this case, because the trial court failed to readvise Petitioner of the Faretta waiver, harmless error does not apply.

Accordingly, the state court's denial of this claim was contrary to and involved an unreasonable application of clearly established federal law as determined by the United States Supreme Court, see 28 U.S.C. § 2254(d), and the Court GRANTS the petition for writ of habeas corpus as to the claim that Petitioner was not readvised of his right to counsel at the subsequent arraignments after the initial

1   arraignment.  The Court's determination that a <u>Faretta</u> error occurred here requires us to reverse the

2   conviction.

3   / / / /

4   **D.      Certificate of Appealability**

5         Rule 11 of the Federal Rules Governing Section 2254 Cases, "[t]he district court must issue or

6   deny a certificate of appealability when it enters a final order adverse to the applicant."  A certificate

7   of appealability should be issued only where the petition presents "a substantial showing of the denial

8   of a constitutional right."  28 U.S.C. § 2253(c)(2).  A certificate of appealability "should issue when the

9   prisoner shows . . . that jurists of reason would find it debatable whether the petition states a valid claim

10  of the denial of a constitutional right and that jurists of reason would find it debatable whether the

11  district court was correct in its procedural ruling."  <u>Slack v. McDaniel</u>, 529 U.S. 473, 484 (2000).

12        The Court finds that Petitioner has raised a valid, nonfrivolous claim of a denial of a

13  constitutional right with respect to the denied claim that Petitioner did not make a knowing and

14  intelligent waiver of his right to counsel at his initial arraignment.  A certificate of appealability is

15  granted as to that claim.

16                                    **Conclusion**

17        Based on the above, IT IS HEREBY ORDERED that the Court **GRANTS in part and DENIES**

18  **in part** the petition for writ of habeas corpus.  The Court **DENIES** the claim that he did not knowingly

19  and voluntarily waive his right to counsel under the Sixth Amendment at the initial arraignment.  The

20  Court **GRANTS** the claim that Petitioner did not knowingly and voluntarily waive his right to counsel

21  under the Sixth Amendment at his subsequent arraignments after the initial arraignment.  Accordingly,

22  Respondent shall dismiss the counts added after the initial arraignment (counts 38-43 and 46-48) and

23  resentence Petitioner, or initiate proceedings to retry Petitioner.

24        IT IS SO ORDERED.

25

26  DATED:  April 29, 2011

27                                        _____

28                                        Hon. Anthony J. Battaglia
                                          U.S. District Judge

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28